**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**MICHAEL WAYNE WILLIAMS KELLY,**

      **Plaintiff,**

**vs.**                                 **CIVIL ACTION NO. 1:18-CV-01260**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered August 29, 2018 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Complaint and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 15 and 16)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for reversal for the reasons stated herein (ECF No. 15), **DENY** Defendant's request to affirm the decision of the Commissioner (ECF No. 16); **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Michael Wayne Williams Kelly (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on March 17, 2015 alleging that his disability began on April 26, 2011[1] because of "diabetes, left foot injuries, hypertension, [and] enlarged heart."[2] (Tr. at 202, 220) His claim was initially denied on June 4, 2015 (Tr. at 123-133) and again upon reconsideration on September 23, 2015. (Tr. at 135-141) Thereafter, Claimant filed a written request for hearing on October 5, 2015. (Tr. at 142-143)

An administrative hearing was held on June 21, 2017 before the Honorable Julianne Hostovich, Administrative Law Judge ("ALJ"). (Tr. at 33-59) On September 12, 2017, the ALJ entered an unfavorable decision. (Tr. at 13-32) On October 2, 2017, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 198-199) The ALJ's decision became the final decision of the Commissioner on August 20, 2018 when the Appeals Council denied Claimant's Request. (Tr. at 1-6)

On August 28, 2018, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant, (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10 and 11) Subsequently, Claimant filed a Brief in Support of Complaint (ECF No. 15), in response, the Commissioner filed a Brief in Support of Defendant's Decision.

---

[1] Claimant filed this current application for benefits after a prior unfavorable decision had been entered by ALJ Benjamin R. McMillion on September 27, 2013; the previous decision is final in all respects. (Tr. at 60-79, 80-85) Claimant concedes that Claimant's onset date would have been September 28, 2013 because of the prior unfavorable decision (ECF No. 15 at 1, fn1), however, the decision issued by ALJ Julianne Hostovich, the ALJ at issue in this appeal, considered the entire period from April 26, 2011, as Claimant did not amend his onset date. (Tr. at 37)
[2] In his Disability Report – Appeal, dated June 12, 2015 submitted after the initial level of review, Claimant alleged that his "eyes are worse; have to have new glasses." (Tr. at 248) In a subsequent Disability Report submitted after the reconsideration level of review on October 6, 2015, Claimant stated that the "VA hospital put me on a double walking shoe with brace attached to help support my ankle" (Tr. at 265) and that his "legs swell up more." (Tr. at 268)

(ECF No. 16), to which Claimant filed his Response. (ECF No. 17) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 40 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 26) Claimant has a high school education plus one year of college. (Tr. at 221) His work history included employment as a home assistant for a mental health intervention service, a laborer at a grocery store, an overnight stocker at a department store, a temp for a temporary work agency, with the most recent being a truck driver for a cleaning supply company. (Id.) Claimant indicated that since the 1990's, he had a commercial driver's license (CDL), however, he was not medically cleared for it. (Id.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any

of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 404.1520a(c). Those Sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and

4

available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion

reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

### **Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2016. (Tr. at 18, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of April 26, 2011 through his date last insured ("DLI") of December 31, 2016. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: obesity and post-traumatic arthritis of the left ankle. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 through his DLI. (Tr. at 21, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

> except he can stand and/or walk no more than 4 hours total during an 8-hour workday; he can sit no more than 6 hours total during an 8-hour workday. He can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant would need to elevate his leg for 15 minutes at a time, three times a day, during scheduled work breaks. He can tolerate occasional exposure to extreme cold, extreme heat, wetness, and

humidity; he must avoid all exposure to vibrations and hazards, such as unprotected heights and moving machinery.

(Tr. at 22, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing past relevant work through his DLI. (Tr. at 26, Finding No. 6) At the final step, the ALJ determined that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there are jobs that exist in significant numbers in the national economy that Claimant could have performed. (Id., Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from April 26, 2011 through his DLI. (Tr. at 27, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant has asserted several arguments in support of his appeal.

First, the ALJ erred at step two of the sequential evaluation process, because her finding of "post-traumatic arthritis of the left ankle" fails to appreciate the extent and severity of this lower extremity impairment insofar as it ignores the additional diagnoses Claimant's treating physicians assessed, as well as those assessments provided by consulting physicians. (ECF No. 15 at 5-7) Claimant contends that this second step severe impairment was noted by Dr. Stephen Nutter, an Agency consultative examiner, however, the ALJ failed to adopt the limitations found by Dr. Nutter, despite her apparent adoption of his diagnosis. (Id. at 7-8) Claimant argues that the ALJ's error was compounded when she determined Claimant could perform light work, despite the significant limitations Dr. Nutter noted in his balancing and walking; further, it is notable that only one other medical source, State agency consultant Dr. Rabah Boukhemis, opined the same RFC assessment as the ALJ, however, he determined Claimant would be limited to sedentary work. (Id. at 8)

7

Secondly, the ALJ erred in her evaluation of the medical opinions of record, which also relates to her error at the second step in the sequential evaluation process: she only gave significant weight to the consultants' RFC assessments, but completely disregarded their findings of other severe impairments. (Id. at 9) The ALJ also did not properly consider the only treating medical source opinion of record, Dr. Jung Lee, Claimant's treating physician at the Beckley VA. (Id. at 9-10) Specifically, the ALJ disregarded Dr. Lee's opinion that Claimant should not work, however, the ALJ was still obligated to assess his opinion, and was required to provide reasons why she did not give his opinion controlling weight. (Id. at 10-11) Claimant argues that Dr. Lee's opinion was entitled to controlling weight, as he had treated Claimant since 2014 and his opinion regarding Claimant's ankle impairment trumped the 2015 opinions offered by the Agency consultants. (Id. at 11) The ALJ failed to understand or appreciate the medical evidence of record which contradicted her own findings in support of her RFC assessment, this was essentially the product of her own inexpert opinion she substituted in place of the conclusions found by medical professionals. (Id. at 11-12)

Claimant also asserts that the ALJ did not even recognize the additional severe impairments found by State agency consultants: fractures of the lower extremity; congenital heart disease; anxiety disorders; personality disorders; and alcohol and substance abuse disorders. (Id. at 12-13) Claimant states that this error is evident because although she gave significant weight to the consultants' opinions, she failed to adopt their findings with respect to Claimant's other severe impairments. (Id. at 13) The ALJ also found several non-severe impairments, but did not provide any medical source evidence in support of this finding; significantly, she did not mention any severe mental impairment, but then addressed and rejected mental health qualification criteria.

(Id.)

Claimant asserts that he has at least two additional severe impairments: traumatic brain injury ("TBI") and syncope. (Id.) Claimant points to the medical evidence from the VA that confirms these impairments are severe and affected his ability to work; specifically, the medical records from Dr. Safiullah Syed show that his employment ended due to syncopal attacks. (Id. at 14-15) The ALJ's failure to recognize these severe impairments is reversible error. (Id. at 16)

Next, Claimant states that originally, he was awarded an 80% service-connected disability, which was subsequently increased to 90% for impairments consisting of: facial scars (80%); tinnitus (10%); traumatic brain disease (10%); limited flexion of knee (10%), and knee condition (10%). (Id.) Claimant contends that the ALJ erred by finding there is "no official notice of decision" from the VA in the record, and improperly discredited his service-connected disability award under the auspices of Bird v. Commissioner of Social Security, 699 F.3d 337 (4th Cir. 2012). (Id. at 16-17) This District has recognized that both the VA and SSA programs are very similar, and that a disability rating by the VA is entitled to substantial weight, but if an ALJ declines to give such weight to a VA rating, the ALJ is required to articulate her reasons why – the ALJ failed to do so in this case, which constitutes reversible error. (Id. at 17-18)

Finally, Claimant argues that the RFC was inconsistent and not based on an identifiable medical source, and is inconsistent with the RFC assessment provided by Dr. Boukhemis who limited him to sedentary work, despite having the same postural limitations. (Id. at 18) Further, Claimant contends that the medical evidence, which included the findings by his treating physician, does not support the ALJ's RFC assessment, particularly where the ALJ found he could balance, stoop, crouch, climb ramps and stairs when he had an unsteady left ankle. (Id.) Claimant

asserts there is no source evidence that supported the ALJ's RFC limitation allowing Claimant to elevate his leg for 15 minutes three times a day during scheduled work breaks. (Id. at 18-19)

Claimant asks the Court to reverse the final decision and that he be awarded benefits. (Id. at 19-20)

In response, the Commissioner argues that the ALJ's identification of Claimant's severe impairments was warranted, and points out that Claimant's own treating physician, Dr. Lee only identified his ankle impairment as severe enough to impact his ability to perform basic work activities. (ECF No. 16 at 8) Claimant's criticism of the ALJ's failure to afford controlling weight to Dr. Lee's opinion is meritless, especially in light of the fact that he did not identify any other severe impairments Claimant contends he has. (Id. at 8-9) Further, the medical evidence, including Claimant's own statements, confirm that his other conditions were not severe or even disabling, and therefore provide ample evidence supporting the ALJ's finding they were not severe. (Id. at 9-10)

The Commissioner asserts that Claimant's disagreement with the ALJ's wording to describe his left ankle impairment is confusing, particularly where the ALJ's terminology is almost precisely the same used by other physicians of record. (Id. at 10) Moreover, Claimant's ostensible reliance on the prior ALJ's second step findings as suggestive the current ALJ's second step findings is also perplexing, given that the ALJ herein was not bound by the prior decision. (Id.) Needless to say, the ALJ considered the limiting affects and symptoms related to Claimant's ankle impairment in her decision. (Id.)

Next, the Commissioner points out that Claimant's argument concerning the ALJ's treatment of his mental impairments is also confusing, because when a claimant alleges a mental

impairment, an adjudicator is obligated to apply the "special technique" under the Regulations to determine severity. (Id. at 10-11) In this case, the ALJ properly found that Claimant had no severe mental impairment. (Id. at 11)

With regard to TBI and syncope, the Commissioner contends that the medical evidence did not justify a finding that they were severe impairments. (Id. at 11-12) The medical record did not demonstrate Claimant's syncope caused significant work-related functional limitations that met the 12-month durational requirement of the Act; the medical record did not demonstrate Claimant's TBI interfered with work activities, indeed, Claimant denied it did during an evaluation of TBI at the VA. (Id. at 12)

The Commissioner further argues that even if the ALJ failed to acknowledge these were severe impairments, the fact that she proceeded to the next steps in the sequential evaluation process and renders this alleged error harmless. (Id.) Despite Claimant's argument that Dr. Boukhemis noted his cardiac condition was severe, he ignores the fact that the ALJ adopted every one of the limitations Dr. Boukhemis found in the RFC. (Id. at 12-13) That the ALJ did not adopt all of Dr. Boukhemis's assessments is of no moment, as Section 404.1527(e)(2) specifically provides that an adjudicator is not bound by a medical source's findings. (Tr. at 13)

The Commissioner asserts that the ALJ's RFC assessment is based upon substantial evidence, and that the ALJ relied on the interpretations provided by State agency medical consultants of the medical evidence, which included Dr. Nutter's evaluation report. (Id. at 14) Notably, the ALJ assigned the greatest weight to Dr. Boukhemis's opinion that Claimant could perform the lifting and carrying requirements of light work, as well as the limitations of only four hours total of standing or walking during the workday. (Id.)

11

With respect to Dr. Lee's opinion, the Commissioner points out that he did not offer a "medical opinion" concerning Claimant's functional capacity for work; regardless, had Dr. Lee specifically opined that Claimant was disabled or unable to work is an administrative finding reserved to the Commissioner and entitled to no special significance. (Id. at 14-15) The ALJ gave credit to Dr. Lee's recommendation that Claimant elevate his leg and incorporated that into the RFC assessment; the Commissioner adds that this was generous given the lack of instructions in the underlying treatment records for Claimant to elevate his leg, and even Dr. Lee did not specify how often Claimant should elevate his leg. (Id. at 15)

The Commissioner argues that not only did the record show that Claimant could perform light work, but also that he could perform sedentary occupations; according to the Medical-Vocational Guidelines, Claimant is not disabled. (Id. at 16-17)

With regard to Claimant's VA disability rating, the Commissioner asserts that Claimant never submitted the rating decision for the ALJ's consideration, and further, it undercuts Claimant's Social Security claim because a 0% disability rating was given for traumatic arthritis and a 0% rating for migraine headaches. (Id. at 17-18) The highest disability rating, 80%, was attributed to Claimant's facial scars, which he has not alleged caused any work-related limitations. (Id. at 18) The 10% rating for TBI represent only "mild" or "transient" symptoms per 38 C.F.R. § 4.130. (Id.) Given these ratings and comparing them with the alleged impairments that interfere with his ability to work, Claimant fails to show how the outcome of this case would have changed had the ALJ deferred more heavily to the VA ratings under Bird.[3] (Id. at 18-19)

---

[3] See, e.g., Lawson v. Berryhill, No. 5:16-cv-869-FL, 2017 WL 7053965, at *8 (E.D.N.C. Dec. 19, 2017), adopted by, 2018 WL 576843 (E.D.N.C. Jan. 26, 2018); Rodgers v. Colvin, No. 5:13-cv-345-D, 2015 WLJ 636061, at *7-9 (E.D.N.C. Feb. 13, 2015). (ECF No. 16 at 18-19)

Finally, the Commissioner points out that contrary to Claimant's request for entry of an award of benefits, a court's province is not to re-weigh the evidence or substitute its findings for the ALJ and normally does not enjoy the discretion to order an award for benefits. (Id. at 19-20) Because substantial evidence supports the final decision, the Commissioner asks this Court to affirm. (Id. at 20)

Claimant submits his reply to the Commissioner's brief, and points out that certain words or expressions in the medical record must be read in context; for instance, if the ankle brace helped, then Claimant should not have been subjected to injections and replacement surgery would not have been discussed. (ECF No. 17 at 1-2) Claimant disputes the Commissioner's characterization of his other impairments as not severe, especially when her own medical consultants found more severe impairments that the ALJ; this underscores the ALJ's improper evaluation of the opinion evidence. (Id. at 2)

Contrary to the Commissioner's argument, the medical record noted Claimant's dizziness due to his blood pressure improved with medication; there is no reference that his syncope improved through medication. (Id.)

Claimant also argues that the Commissioner is advancing new arguments not addressed by the ALJ with regard to her interpretation as to Dr. Lee's opinion and determination that Claimant is capable of sedentary work. (Id. at 3) Claimant asserts that his ankle impairment was not service-related and therefore would not be connected to his VA disability rating. (Id. at 4) Finally, the ALJ deviated from the holding in Bird, and the Commissioner's cited case law is inapposite to the issues herein. (Id. at 4-5)

**The Relevant Evidence of Record**[4]

      The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

      <u>Medical Records Related to Ankle Impairment:</u>

      The record showed that after jumping off a wall in 2010 (Tr. at 329), Claimant underwent arthroscopic surgery for the left ankle and a subtalar joint fusion for the left foot at Roanoke Memorial Hospital on October 6, 2011. (Tr. at 292) Claimant had been using a walking boot prior to having surgery (Tr. at 423-425), and after surgery, Claimant continued to wear a boot or brace, and had been custom made and changed periodically over the years to help alleviate pain and ankle instability. (Tr. at 358-365) From May 2011 through January 2016, Claimant received care for his foot and ankle pain at the Foot & Ankle Clinic in Princeton, West Virginia. (Tr. at 366-425) In addition to treatment for his foot and ankle pain, Claimant received treatment for ingrown toenails in connection with diabetes as well as gout. (e.g., Tr. 394, 399, 401) Claimant's complaints of foot and ankle pain were generally constant during his treatment at the Foot & Ankle Clinic, though in December 2014, Claimant reported that the brace helped decrease his pain symptoms. (Tr. at 387, 413)

      On June 26, 2014, Claimant established care at the Beckley VA Medical Center (hereinafter referred to as "Beckley VA") for his ankle pain. (Tr. at 673) Records dated April 22, 2015 note that "[t]he surgery was successful in eliminating subtalar motion and pain, though he has had progressive pain proximal to his ankle joint with swelling after activities." (Tr. at 451, 778) "Bracing has been moderately effective in controlling discomfort." (<u>Id</u>.) Claimant's ankle

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

was not unstable on ligament testing, though the impression was left ankle osteoarthritis, advancing, and he was encouraged to lose weight. (Tr. at 778-779) However, because of inflammation of the ankle, injection was recommended. (Tr. at 779)

By July 2015, injections provided no significant improvement, and Claimant reported continued symptoms, therefore, more immobilization of the ankle was recommended; total ankle replacement "may be the definitive treatment in the future", however, because of his weight, weight loss was discussed. (Tr. at 512) On August 6, 2015, a new custom ankle foot orthosis and shoes were fit for Claimant to help with walking. (Tr. at 361) The new brace "did help support the ankle and foot while reducing pain as well as correcting dorsiflexion/planterflexion when checked standing and ambulating." (Id.)

A Beckley VA orthopedic re-evaluation treatment note from July 7, 2016 indicated that despite the immobilization from a brace, Claimant developed pain and swelling in his left ankle that had not responded to corticosteroid injections. (Tr. at 852) X-rays showed nonspecific soft tissue swelling and mild degenerative changes (Tr. at 961-962) Because no other management other than injections and possibly arthrodesis was available at that facility, Claimant was referred to a foot and ankle specialist at the Hunter Holmes McGuire VA Hospital in Richmond, Virginia (hereinafter referred to as "Richmond VA"). (Tr. at 852)

On October 31, 2016, Claimant was seen at the Richmond VA and reported that although the brace on his left foot has helped some with the pain, it "has not cleared his other pain" and that this pain was constant, interferes with his daily activity and ability to walk. (Tr. at 1000) The examining orthopedist was unable to locate a clear pathology for Claimant's left foot pain, therefore a CT scan was recommended. (Id.) Because of his diabetes, he was not a good candidate

for a total ankle at the time. (Id.) Later, in November 2016, a CT scan taken at the Beckley VA showed a "near complete bony union" in the area of the fusion and showed "mild tibiotalar joint degenerative changes." (Tr. at 961)

Stephen Nutter, M.D., Internal Medicine Examination Report:

On April 15, 2015, Claimant appeared for his disability examination with Dr. Nutter. (Tr. at 329-333) Claimant reported he was disabled because of the continuous pain in his left ankle; he reported walking, standing, kneeling, squatting, and going up and down stairs increases his ankle pain. (Tr. at 329) Dr. Nutter observed Claimant wore a brace on the left ankle and that there was swelling, warmth and redness in the left foot.[5] (Id.) It was noted that Claimant ambulated with a limping gait that is not unsteady, lurching, or unpredictable; he did not require a handheld assistive device. (Tr. at 330) He had normal muscle strength with pain and tenderness in the left ankle and foot (and reduced range of motion). (Tr. at 332) Dr. Nutter confirmed lower extremity edema (Tr. at 331) and diagnosed posttraumatic arthritis. (Tr. at 332) Dr. Nutter noted further that Claimant's left ankle pain, tenderness, and reduced range of motion "interferes with his balance and ability for walking maneuvers." (Tr. at 333)

Medical Records Related to Cardiac Conditions, Syncope, and Diabetes:

Claimant reported chest pain symptoms as early as 2010, though it would resolve on its own after 10 to 15 minutes. (Tr. at 330) However, on one occasion in June 2016, Claimant described less transient symptoms, and visited the emergency room and was discharged in improved condition. (Tr. at 832)

---

[5] Dr. Nutter noted "redness and warmth in the right foot", however, this may well be a scrivener's error, because upon physical examination, Dr. Nutter noted pain and tenderness in Claimant's left ankle and foot, "but no in the right ankle or foot." (Tr. at 332)

In 2013, his primary care physician, Domingo Javier, M.D. referred him to Jack C. Meschel, M.D., a cardiologist, because of his ongoing complaints of chest pain. (Tr. at 311-312) Dr. Meschel added syncope as a diagnosis in treatment notes dated August 15, 2013 (Tr. at 310) and December 23, 2013 (Tr. at 308), although numerous other treatment records from 2014 and 2015 do not include a syncope diagnosis. (Tr. at 297, 298, 783, 781, 787, 788, 794, 795, 789, 800) Dr. Meschel frequently counseled Claimant to follow a low-calorie and low-salt diet.[6] (Tr. at 297, 298, 308, 311) A treatment note dated March 11, 2014 indicated that Claimant's blood pressure was up and he reported some dizziness, "but it is markedly improved from before since the increase in his medication." (Tr. at 297) Dr. Meschel continued to treat Claimant through 2014, 2015 and 2016 and treated his cardiac conditions, including hypertension, with medications, which were renewed with few adjustments at his various visits. (e.g., Tr. at 788, 787, 781)

The records reflect that Claimant's diabetes was followed by his primary care physician at the Beckley VA, Jung Lee, M.D. Treatment notes show that prescribed medication "controlled" Claimant's diabetes. (Tr. at 452, 510, 774) Claimant reported that he had not been hospitalized for diabetic incident. (Tr. at 330)

<u>Medical Records Related to Traumatic Brain Injury (TBI):</u>

On March 29, 2014, Claimant underwent an initial evaluation of residuals of TBI at the Beckley VA and the results of the findings were compiled by Safiullah Syed, M.D. in a questionnaire. (Tr. at 453-460, 597-604) Claimant was diagnosed with TBI as a service-connected injury when he sustained lacerations to the bridge of his left eye, forehead and upper lip when he was hit with a beer bottle during a drinking fight on April 10, 1994; non-service related head

---

[6] The medical record reflects that oftentimes during the relevant period that Claimant endorsed heavy alcohol consumption. (e.g., Tr. at 338, 471, 647)

injuries included later incidents where he was also hit in the head with a "tire road" at the mall and on another occasion hit with a 45-pound dumb bell at the gym. (Tr. at 453-454, 597-598) It was noted that Claimant reported no passing out spells or "blackout spells" until three years ago, where he would feel dizzy and pass out. (Id.) It was also noted that he had been diagnosed with hypertension and diabetes and takes medication for these conditions. (Tr. at 454, 598)

Dr. Syed noted that the residuals related to Claimant's TBI impacted his ability to work insofar as he has tension and migraine type headaches, with mild to moderate symptoms, for which Claimant took over the counter medication. (Tr. at 456-457, 600-601) Dr. Syed opined that Claimant's "reported blackout spells which are associated with dizziness and falls . . . are syncopal attacks secondary to reduced blood flow to the brain." (Tr. at 457, 601) Dr. Syed further noted that passing out can happen with TBI, but only during concussion; "head injury has happened several years ago and these spells started in the last three years." (Id.) Dr. Syed opined that Claimant's syncopal attacks "are more likely caused by medical issues and less likely caused by the TBI" and that his headaches are also likely unrelated to his service-connected injuries. (Tr. at 457, 460, 601, 604) Dr. Syed opined that Claimant's functional impairment was mild to moderate. (Tr. at 460, 604)

On August 18, 2016, Dr. Syed conducted a Review Evaluation of the residuals of TBI and compiled his findings in a disability benefits questionnaire. (Tr. at 843-847) Dr. Syed concluded:

> [Claimant] continues to have headaches which are at least as likely as not related to the TBI of service. The current level of severity of the residual migraine headaches is moderate. Medications can help. He is not taking any prescribed medications for headaches and is not taking any OTC meds at this time . . . [he] has not worked since 2011 due to syncopal attacks at the time. He reports occasional syncopal attacks which are unrelated to TBI.

(Tr. at 847)

18

Veterans Administration Disability Rating:

The record indicates that Claimant was originally awarded an 80% service-connected disability award consisting of facial scars (80%), tinnitus (10%), TBI (10%), impaired hearing (0%), migraine headaches (0%), and traumatic arthritis (0%). (Tr. at 505, 985) Later, he received a 10% increase, to a 90% service-connected disability award consisting of facial scars (80%), tinnitus (10%), limited flexion of knee (10%), knee condition (10%), limited flexion of knee (10%)[7], TBI (10%), migraine headaches (0%), and impaired hearing (0%). (Tr. at 994, 995)

State Agency Medical Consultants Opinion Evidence:

At the initial level of review, on June 4, 2015, Dr. Rogelio Lim provided an RFC assessment based on the record of evidence and opined that Claimant was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently, could stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, unlimited push/pull other than shown for lift/carry, could occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. (Tr. at 95-96) Dr. Lim indicated that Claimant had a "balance problem" due to the left ankle fracture. (Tr. at 96) Dr. Lim assessed a light RFC. (Tr. at 97, 98)

At the reconsideration level of review, on September 14, 2015, Dr. Rabah Boukhemis endorsed the same limitations in the RFC assessed by Dr. Lim, except he limited Claimant to standing/walking 4 hours. (Tr. at 112-113) Dr. Boukhemis assessed a sedentary RFC. (Tr. at 115)

Treating Physician Opinion Evidence:

Dr. Jung Lee was Claimant's primary care physician at the Beckley VA and he provided

---

[7] "Limited Flexion of Knee" is listed twice.

hand-written responses to medical interrogatories on May 30, 2017. (Tr. at 1005) Dr. Lee indicated that Claimant's severe impairments, as defined by the SSA, consisted of his left ankle that causes constant pain and is unstable. (Id.) Dr. Lee indicated that Claimant's left leg brace was medically necessary and reasoned that it was necessary after his October 2011 surgery and provided support because the left ankle is not stable. (Id.) Dr. Lee indicated that he would advise that Claimant keep his leg elevated to relieve pain, but not that Claimant would need "to lie down at unpredictable intervals during an 8 hour day." (Id.) Dr. Lee found Claimant's complaints consistent with his findings and diagnoses. (Id.) When asked, "[a]ssuming [Claimant] was employed, on an average, how often would you anticipate that his impairments or treatment would cause him to be absent from work?" Dr. Lee responded, "do not work." (Id.) Dr. Lee indicated that his responses were based upon his own medical opinion and not by Claimant's self-reporting. (Id.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he is unable to work because of his "lack of movement"; he had been a truck driver, but his CDL was taken away because he couldn't move his ankle to operate the clutch. (Tr. at 40) Plus, he takes a bunch of medications that make him drowsy. (Id.) He also stated that he blacks out sometimes. (Id.)

Claimant estimated that because of his ankle, he could walk about ten minutes before he had to sit down; he has constant pain in his leg and if he sits for too long, it swells, making him hurt more. (Tr. at 40-41) To relieve his pain, he stated he mostly lays around and sometimes he soaks his left foot in Epsom salt. (Tr. at 41) Claimant testified that there's really nothing he can do for his pain, however. (Id.) He constantly changes his positions. (Id.) Claimant estimated that he

is able to stand in one position for about 10 to 15 minutes. (Tr. at 42) Claimant also testified that in about five minutes of standing, his leg starts swelling; it starts swelling from walking, too. (Tr. at 50) Claimant also has problems with sleeping. (Tr. at 50)

On a typical day, Claimant testified that he lays or sits around, talks to his kids or watches TV sometimes, and sometimes, he just wants to be by himself. (Id.) His live-in girlfriend and kids do all the household chores; he does no yardwork, but sometimes, he will grocery shop with his family to get out of the house. (Tr. at 42-43) As for other activities, Claimant attends doctor's appointments and sometimes visits his mother; he drives about twice a week. (Tr. at 43) Claimant testified that he tries to help his youngest child with homework, but not with the new technology because it's too advanced for him; he sometimes takes his kids to school or pick them up afterwards. (Id.) Claimant does not belong to any groups or goes to any meetings. (Tr. at 51)

Claimant stated that he takes ten different medications that are prescribed to him from the VA; he testified that some medications are for his blood pressure, sugar, stomach issues and depression. (Tr. at 44) He wasn't sure what all his medications are for, though. (Id.) He does experience side effects from his medication, such as dizziness and lightheadedness and that he gets blurred vision every day. (Tr. at 45)

Claimant explained that he sustained his ankle injury by jumping off a two- or three-foot wall, which required surgery. (Id.) Since 2011 when he had surgery, he has worn a brace or boot on his foot. (Id.) He testified that he has had his second brace, but he had other braces custom made. (Id.) Claimant testified that the VA was going to perform another surgery on his ankle because it doesn't move the way it should and because he's in constant pain. (Tr. at 49, 51) He stated that he keeps his foot elevated when at home, though it doesn't really help with his pain, but

21

it helps with swelling. (Tr. at 49-50) Claimant testified that the swelling in his leg is the primary problem, which is why he sits around his home with his leg elevated. (Tr. at 50)

Claimant testified that he also suffered from three brain injuries, the first of which he received during his military service. (Tr. at 46) He explained that he got hit with a beer bottle in his face, causing him eye, lip, nose and forehead lacerations. (Id.) He stated that he received a 10% service-connected disability for his traumatic brain injury. (Id.) Since then, he suffered two additional brain injuries: one, when he was walking out of the Mercer Mall, some people were fighting and he got hit in the back of the head with a tire tool; the second involved him getting hit in the head with a 45-pound weight while at a friend's house. (Id.)

Claimant testified that sometimes, he loses consciousness. (Id.) Claimant explained that he blacks out for a few minutes, and that he is aware when it happens; sometimes, he will black out or pass out and end up on the floor. (Tr. at 47) Claimant estimated that he experiences the "little losses of conscious[ness]" about two or three times a week; he stated that he has not experienced the "bigger loss of conscious[ness]" as often as he used to, but has had a few episodes where he "fell out totally." (Id.) He estimated that the last time he totally fell out was about a month ago, and that he has these episodes every couple of months. (Tr. at 48) Claimant testified that his doctors at the VA link these episodes to his traumatic brain injury. (Id.)

Claimant also testified that he suffers from daily headaches, some are big and as painful as migraines and some are small. (Tr. at 48-49) He has big headaches every two weeks; for these, he stays to himself, lays down in complete darkness and has no noise. (Tr. at 49)

Claimant testified that he currently has an 80% VA disability rating, which he estimated would increase because he had other things pending; he stated that his disability rating was for his

ankle and head. (Tr. at 51) Although his ankle was not related to his military service, Claimant stated that he had a knee injury that the Government related to his ankle. (Tr. at 52)

Vocational Expert ("VE") Testimony:

When asked about a hypothetical individual with the limitations in the controlling RFC, *supra*, the VE responded that the individual could work as a parking lot booth attendant (DOT #915.473-010), a non-governmental mail clerk (DOT #209.587-026), and a car wash attendant (DOT #915.667-010). (Tr. at 53-55) The VE testified that if the individual had to elevate his legs periodically throughout the day at unscheduled times, the individual would not be able to perform the jobs identified unless there was an accommodation and/or modification of job task. (Tr. at 56) The VE confirmed that the jobs identified are all light, unskilled, basically entry level jobs. (Id.)

The VE testified that if the individual experienced three black out spells and lasting a minute for each, without any residuals thereafter, the individual could still perform all three jobs identified, as this equated to being off task less than 9% of the workday. (Tr. at 56-57) Further, if the individual had black out spells with residuals, and lay down afterwards or put a wet compress over his face or go to the restroom, that would gravely affect being off task for more than allowed by an employer; the VE also stated that an individual who had an actual fainting spell on average once every two months would be unable to complete any work unless there was a job accommodation or modification. (Tr. at 57-58)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such

decision." Blalock, 483 F.2d at 775.

## **Analysis**

As noted *supra*, Claimant has asserted that the ALJ erred by failing to add at least two

severe impairments: syncope and TBI. Claimant also takes issue with the ALJ's step two findings

because not all of the severe impairments found by the Commissioner's own medical consultants

were adopted.

### Determining Severe Impairment:

A "severe" impairment is one "which significantly limits your physical or mental ability to

do basic work activities." See 20 C.F.R. § 404.1520(c). "Basic work activities" refers to "the

abilities and aptitudes necessary to do most jobs." Id. § 404.1522(b). The Regulations provide

examples of these activities:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling,
> reaching, carrying, or handling;

24

(2) capacities for seeing, hearing, and speaking;
(3) understanding, carrying out, and remembering simple instructions;
(4) use of judgment;
(5) responding appropriately to supervision, co-workers and usual work situations; and
(6) dealing with changes in a routine work setting.

Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Additionally, Claimant had to prove that he had an impairment (or combination of impairments) that had more than a minimal effect on his ability to do basic work activities for a continuous period of no less than 12 months. 20 C.F.R. § 404.1505(a); SSR 96-3, 1996 WL 374181. The impairment must also not "be reasonably controlled by medication or treatment[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Claimant also bears the burden of establishing a disabling impairment. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (holding that the claimant bears the burden of proof and persuasion at steps one through four, stating "it is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so").

Starting with the non-severe physical impairments noted at step two, the ALJ listed several diagnoses from the record of evidence: hypertension; mitral valve insufficiency; premature ventricular contractions; tricuspid valve insufficiency; syncope; transient ischemic attacks; peripheral vascular disease with claudication; coronary artery disease with angina pectoris; gastroenteritis; type II diabetes mellitus; hyperlipidemia; hypokalemia; bilateral hearing loss; and headaches related to a history of multiple head traumas. (Tr. at 18-19) The ALJ also noted that

"[x]-rays of the claimant's chest dated June 29, 2016, revealed clear lungs and a normal sized heart (Exhibits B-2F, B-10F, B-11F, B-12F, B-13F[.]"[8] [9] (Tr. at 19) Though the ALJ does not identify "TBI" by those explicit terms, the ALJ clearly recognized that Claimant's medical history included "multiple head traumas", and explicitly recognized Claimant's syncope diagnosis.

Claimant briefly addresses the ALJ's omission of finding a "severe mental health impairment" and criticizes the ALJ's rejection of "mental health qualification criteria." (ECF No. 15 at 13) To that end, the ALJ noted that Claimant's mental impairments, depression and anxiety, were non-severe because they did not cause more than a minimal limitation in Claimant's ability to perform basic work activities. (Tr. at 19) For reference, the ALJ reviewed Claimant's mental health treatment at the Beckley VA, where Claimant reported that he was depressed because he was unable to work. (Tr. at 19, 426-779, 807-832) The ALJ also noted that Claimant had a history of alcohol abuse, where in 2015 "detoxification was recommended, but the claimant was not interested." (Tr. at 19, 426-779) The ALJ observed the psychological examiners' findings: Tonya McFadden, Ph.D. diagnosed Claimant with unspecified depressive disorder and alcohol use disorder (Tr. at 19, 336-342) and Elizabeth Jennings, M.A. diagnosed Claimant with somatic symptom disorder, persistent depressive disorder, dysthymia, and generalized anxiety disorder, provisional. (Tr. at 19, 351-357)

---

[8] As noted *supra*, Claimant alleged an "enlarged heart" as one of his disabling condition in application forms. (Tr. at 220)

[9] The ALJ cited several exhibits in the record following the list of non-severe impairments she found from the evidence. Respectively, they concern: office treatment records dated April 30, 2013 to December 24, 2014 from Domingo G. Javier, M.D. (Tr. at 294-328); hospital records dated March 29, 2014 to April 10, 2016 from Beckley VA (Tr. at 426-779); progress notes dated May 28, 2014 to March 2, 2016 from Meschel Cardiology, P.C./Jack C. Meschel, M.D. (Tr. at 780-806); emergency department records dated June 29, 2016 from Beckley VA (Tr. at 807-832); and progress notes dated June 30, 2016 to November 9, 2016 from Beckley VA (Tr. at 833-958). Claimant asserted that the ALJ "never provided one medical source for any of these diagnoses" (ECF No. 15 at 13, fn9), however, it is apparent that the ALJ reviewed these cited exhibits that provided the support for diagnoses, including the records from the Beckley VA and from Dr. Meschel.

From there, the ALJ performed the "special technique" pursuant to Section 404.1520a, *supra*. (Tr. at 19-21) Ultimately, the ALJ found that because Claimant's mental impairments caused no more than mild limitations in any of the functional areas, they were by definition under the Regulations, non-severe; the ALJ noted further that State agency psychological consultants, Ann Logan, Ph.D. and James Binder, M.D. also opined that Claimant's mental impairments were non-severe. (Tr. at 21) Though Claimant does not appear to contest the ALJ's findings with respect to his mental impairments, his critique of the ALJ's discussion of the severity of his limitations in the four broad areas of functioning is misplaced, given that the Regulation require adjudicators to evaluate mental impairments in this fashion.

There is no dispute that the ALJ found just two severe impairments, however, there is no reversible error when an adjudicator fails to list all a claimant's severe impairments at step two so long as at least one severe impairment is found and that the adjudicator considers all severe impairments and limitations therefrom in the next steps in the sequential evaluation process. See Lauver v. Astrue, No. 2:08-cv-87, 2010 WL 1404767, at *4 (N.D.W. Va. Mar. 31, 2010).

In this case, the ALJ considered the limitations not only from Claimant's ankle impairment, which included constant pain, swelling, difficulties in walking and sitting (Tr. at 22-24)[10], but she also considered Claimant's limitations associated with his alleged episodes of blacking out, both

---

[10] Of interest here is that the ALJ acknowledged the diagnoses the various providers of record ascribed to the ankle impairment: from the Foot and Ankle Clinic in May 2011, Achilles tendinitis and ankle joint pain (Tr. at 23); from the Foot and Ankle Clinic in January 2015, chronic venous hypertension with inflammation and sinus tarsi syndrome (Id.); from the Beckley VA in April 2015, left ankle osteoarthritis, advancing, status post subtalar joint, left ankle fusion, diabetes mellitus, controlled, and exogenous obesity (Tr. at 24); and from the Beckley VA in July 2016, chronic left ankle pain and degenerative changes post subtalar joint fusion (Id.). As noted by Claimant, the ALJ also recognized Dr. Nutter's diagnosis, posttraumatic arthritis. (Tr. at 24) Further, the ALJ noted from the October 31, 2016 examination at the Richmond VA that Claimant was not considered a good candidate for a total ankle replacement due to his uncontrolled diabetes mellitus. (Id.)

for short and longer periods of time, the circumstances related to his history of brain injuries[11] as well as his daily headaches and migraines every two weeks. (Tr. at 22) Claimant's contention that the ALJ's finding only "posttraumatic arthritis" at step two instead of listing the additional severe impairments, particularly those found by State agency medical consultants, lacks merit. Of interest here is that despite Drs. Lim and Boukhemis finding more severe impairments, the diagnoses do not alone translate into disability where there has been no evidence to substantiate a related functional loss preventing Claimant from work. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). Dr. Lim found Claimant was capable of light work, Dr. Boukhemis found that Claimant was capable of sedentary work, but neither found Claimant disabled. (Tr. at 98-99, 114-115)

Moreover, the ALJ did not fail in "appreciating the extent and severity of his limitations" of the ankle impairment (ECF No. 15 at 6-7) because it is clear that she did[12], and that the findings and conclusions of the various treatment providers of record were considered throughout the decision. This is akin to the situation that this Court addressed in Lewis v. Astrue, 937 F.Supp.2d 809, 819 (S.D.W. Va. Mar. 29, 2013): the claimant therein took issue with the ALJ's step two findings of mental impairments, and neglected to add others, but it was clear that the effect and limitations of the omitted diagnoses were considered beyond step two, thus there was no reversible error.

---

[11] The ALJ also considered the records from the VA that concerned Claimant's TBI, which includes his service-connected disability rating; this will be discussed in greater detail, *infra*. (Tr. at 26)

[12] Claimant argued that the ALJ "simply did not understand the seriousness of the medical evidence regarding Plaintiff's ankle. She never mentioned (Tr. 24) Dr. Nutter's finding that ankle pain, tenderness and range of motion interfered with his balance and ability for walking maneuvers, and he walked with a limp." (ECF No. 15 at 11) The ALJ noted from Dr. Nutter's examination that Claimant "displayed a limping gait that was not unsteady, lurching, or unpredictable", pitting edema in both lower extremities, "pain and tenderness in his left ankle and foot", ability to walk on his toes, but not on his heels due to pain and range of motion loss, inability to squat or tandem gait, and decreased range of motion in his right knee and left ankle. (Tr. at 24) Claimant's argument that the ALJ did not consider Dr. Nutter's examination findings is without merit.

Accordingly, the undersigned **FINDS** the ALJ did not commit reversible error at step two.

<u>Evaluation of Opinion Evidence:</u>

Because Claimant takes issue with the ALJ's evaluation of opinion evidence, as a practical matter it is best to review how the SSA governs the criteria for evaluating opinion evidence prior to addressing the ALJ's RFC assessment and fifth step determination; per Section 404.1527(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(1)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.

With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2).[13] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. <u>Id</u>. § 404.1527(c)(2). Additionally, the Regulations state that the Commissioner "will always give good

---

[13] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u>, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id.

Starting with the State agency medical opinions provided by Dr. Rogelio Lim and Dr. Rabah Boukhemis, described *supra*, the ALJ gave "significant weight" to these opinions, but gave the "greatest weight" to the opinion by Dr. Boukhemis, noting that it was the "most recent opinion, and finds that it is most consistent with the totality of the record." (Id.) Claimant takes issue with the ALJ's failure to adopt the other severe impairments noted by Dr. Boukhemis, however, this issue was previously addressed *supra*, Claimant also raises the argument that the ALJ's evaluation of Dr. Boukhemis's opinion was without any explanation, but only "cherry-picked" his RFC assessment. (ECF No. 15 at 9) Following the weight afforded to Dr. Boukhemis's opinion, the ALJ noted the following from the record:

> x-rays of the claimant's left ankle dated September 3, 2014, revealed a metallic screw at the talo calcaneous area as well as mild degenerative changes of the left ankle with overlying soft tissue swelling (Exhibit B-10F, page 1). (Tr. at 426) On July 7, 2016, subsequent x-rays of the claimant's left ankle indicated mild degenerative changes with stable appearance of a calcaneotalar screw as well as nonspecific soft tissue swelling at the ankle (Exhibit B-14F, pages 3 and 4). (Tr. at 961-962) A CT of the claimant's left foot and ankle on November 20, 2016, revealed status post subtalar fusion with near complete bony union across the posterior facet subtalar joint as well as mild degenerative changes at the tibiotalar joint (Exhibit B-14F, pages 2 and 3). (Tr. at 960-961)

(Tr. at 25) It is obvious that the ALJ made numerous citations to the medical record as explanation or justification for the "greatest weight" afforded to Dr. Boukhemis's opinion, therefore, Claimant's argument to that extent lacks merit. However, as discussed *infra*, substantial evidence did not support the "greatest weight" afforded to Dr. Boukhemis's opinion.

With regard to the opinion evidence from Dr. Jung Lee, the ALJ observed that "on May 30, 2017, Dr. Jung Lee from Beckley Veterans Area Medical Center, completed a physical

assessment form and opined that the claimant would need to keep his left leg elevated in order to relieve pain symptoms in his left ankle." (Tr. at 25, 1005) The ALJ also noted that Dr. Lee "recommended that the claimant not work."[14] (Id.) The ALJ then stated, "affords some weight to the opinion of this treating physician, but finds the totality of this record supports the claimant's ability to perform some work." (Id.) The ALJ also observed that Dr. Lee's recommendation that his patient not work is not a medical opinion, but an administrative finding reserved to the Commissioner. (Id.) As noted *supra*, the Regulations specify that medical opinions include ". . . what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Opinions on issues reserved to the Commissioner are not entitled to "any special significance" Id. § 404.1527(d)(3). In short, the ALJ was not obligated to give Dr. Lee's opinion that Claimant not work "controlling weight" and did not err by neglecting to do so.

Claimant also contends that Dr. Lee's opinion "as to the extent and severity of [Claimant's] ankle impairment clearly trumped the 2015 opinions of Drs. Lim and Boukhemis" because Dr. Lee had been treating Claimant since 2014 and ostensibly because Dr. Lee gave a more recent opinion than those provided by the State agency medical consultants. (ECF No. 15 at 11)[15][16] It is noted that Drs. Lim and Boukhemis were able to review the evidence of record as of June 4, 2015 and

---

[14] The parties appear to dispute that Dr. Lee actually gave an opinion that Claimant should not work at all, given that "do not work" was written in response to a question assuming Claimant was employed. Regardless, the ALJ interpreted Dr. Lee's response as his recommendation, a factual interpretation that this Court does not address in a substantial evidence review.

[15] Claimant refers to Fraley v. Astrue, No. 2:10-cv-796, 2011 WL 2681647, at *7 (S.D.W. Va. July 11, 2011) (M.J. Stanley) (error to rely on non-examining state agency medical source opinions because they did not have the benefit of important medical developments) and Fluharty v. Colvin, No 2:14-cv-25655, 2015 WL 5476145, at *9-10 (S.D.W. Va. Sept. 17, 2015) (J. Copenhaver) (relying chiefly on an opinion evinced before key evidence was accumulated was error). (Id.)

[16] Claimant also asserts that "Dr. Lee's opinion was uncontradicted in this record." (Id.) (underline in original) To the extent that Claimant is referring to the opinion that Claimant should not work, clearly, the opinions of Drs. Lim and Boukhemis do indeed contradict this opinion because both opined Claimant was not disabled, thus capable of some form of work.

September 14, 2015, respectively, including the consultative examination report provided by Dr. Nutter. (Tr. at 87, 104) There is no dispute that neither medical consultant reviewed any of the medical records that had been generated since they issued their opinions. See, generally, Hampton v. Colvin, No. 1:14-cv-24505, 2015 WL 5304294, at *21-22 (S.D.W. Va. Aug. 17, 2015); Starcher v. Colvin, No. 1:12-cv-01444, 2013 WL 5504494, at *7 (S.D.W. Va. Oct. 2, 2013) ("[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where 'additional medical evidence is received that in the opinion of the [ALJ] ... may change the State agency medical ... consultant's finding' ... is an update to the report required." Id. (quoting Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir.2011)) (ellipses and brackets in original).

In this case, there had been additional, potentially significant changes in Claimant's treatment for his orthopedic impairment: not until 2016, long after State agency medical consultants issued their opinions concerning the medical evidence of record, did Claimant's treating orthopedist, Dr. Traynham, find that his ankle condition had not improved with conservative treatment, and that surgical intervention was being considered; by 2017, Dr. Lee, Claimant's primary care physician, corroborated Dr. Traynham's opinion to the extent that Claimant's ankle remained unstable. In sum, the medical evidence of record indicates that Claimant's ankle impairment deteriorated to the extent that once again, surgery was being considered. This appears to be an important medical development that could have affected the

opinions provided by the State agency medical consultants and even by the consultative examiner, particularly with respect to Claimant's standing/walking limitations.

It must be noted that Dr. Lee's opinion(s) consisted of a single page, and other than opining that Claimant's brace was medically necessary, that his left ankle was "not stable", that he elevate his leg to relieve pain, and that he "not work"; there is nothing else in his opinion that concerns what Claimant *can still do* despite his impairment. Nevertheless, SSR 96–2p[17] expressly provides that an ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." See also, Mauzy v. Astrue, 2010 WL 1369107, at *17 (N.D.W. Va. Mar. 30, 2010). In sum, the ALJ's decision is simply not sufficiently specific to make clear to this Court why the ALJ gave Dr. Lee's opinion "some weight."

Claimant has also argued that the ALJ supplanted her own inexpert opinion without the benefit of any medical source of record when she stated, "the record indicates that surgery is not a viable alternative until the claimant's diabetes mellitus is under better control, which could be obtained, at least in part, with diet modification and increased exercise." (ECF No. 15 at 12; Tr. at 25) The ALJ was referring to the October 31, 2016 Richmond VA report that indicated Claimant was not a good candidate for a total ankle replacement due to his uncontrolled diabetes mellitus. (Tr. at 24, 1000) A review of the record indicates that Claimant was sent to the Richmond VA from his orthopedist at the Beckley VA for a consultation "for possible evaluation for further

---

[17] As noted previously, because this claim was filed prior to March 27, 2017, the prior Ruling is applicable.

surgical options." (Tr. at 1000) The treatment note does not indicate that Claimant could get his diabetes under control if he properly dieted and exercised.

Though the ALJ makes no mention of it in the written decision, the ALJ's "opinion" that Claimant should diet and exercise, standing alone, is not without the benefit of *any* medical source from the record: Dr. Dr. Jack Meschel, cardiologist, recommended a low sodium and low calorie diet would be helpful for addressing Claimant's blood pressure issues (Tr. at 297, 298, 308, 311, 781); Dr. John Traynham, III,[18] orthopedist, encouraged weight loss, "which will improve his overall lower extremity complaints" (Tr. at 493-494, 509, 517-518, 778-779) and had stated "[t]otal ankle replacement may be in the definitive treatment in the future and weight loss was discussed at some length. I am sure the reconstructive ankle surgeons would not replace the ankle at his current weight." (Tr. at 512-513); and Claimant's treating physician, Dr. Lee, stated his "plan" to address Claimant's obesity was "diet and exercise." (Tr. at 489, 510, 769) Whether the ALJ's statement rises to the level of reversible error seen in Grimmett v. Heckler, 607 F.Supp. 502, 503 (S.D.W. Va. Apr. 17, 1985)[19] is not clear, because the record does demonstrate that Claimant's treating physicians recommended diet and exercise, though not explicitly in relation to getting his diabetes under control.

Accordingly, the undersigned **FINDS** that given the important medical developments that occurred during Claimant's treatment since the opinions submitted by the State agency medical consultants, the ALJ's evaluation of those opinions as provided by Drs. Lim and Boukhemis is not

---

[18] Dr. Traynham referred Claimant to Hunter Holmes McGuire Hospital for the consult from the foot and ankle specialist to see if he is a candidate for a total ankle replacement. (Tr. at 852)
[19] "In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional. See, Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983)." Id. (internal quotations and citations in original)

supported by the substantial evidence. The undersigned further **FINDS** that the ALJ's evaluation of Dr. Lee's opinion is not supported by the substantial evidence insofar as "good reasons" for discounting the treating physician's opinion were not provided in contravention to the applicable Regulations. 20 C.F.R. § 404.1527(c)(2).

The VA Disability Rating:

With respect to Claimant's VA disability rating, the ALJ herein noted that at the time of the administrative hearing, the VA deemed him 80% disabled based on his history of TBI. (Tr. at 25) The ALJ observed that the record had no official notice of decision[20] concerning this disability rating, however, the progress notes from the Beckley VA corroborated the 80% service-connected disability related to Claimant's facial scarring, tinnitus, and traumatic brain disease. (Tr. at 25-26, 426-779) The ALJ further noted, "the claimant testified regarding at least three episodes of trauma to his head; however, only one of these occurred while he was in the United State[s] military." (Tr. at 26) Pursuant to the Fourth Circuit holding in Bird v. Commissioner of Social Security, 699 F.3d 337 (4th Cir. 2012), the ALJ noted that VA decisions are presumptively entitled to substantial weight unless there are good reasons for giving them less weight. (Id.) The ALJ then gave "little weight" to Claimant's service-connected disability rating "as it is based on different rules and specifications than relied on by the [SSA]." (Id.)

It is important to recognize that the VA rating decision discussed in the Bird case "resulted from an evaluation of the *same* condition and the *same* underlying evidence that was relevant to

---

[20] Though Claimant takes issue with the ALJ's notation that there was no "official notice" from the VA concerning his disability rating (ECF No. 15 at 16-17), the ALJ's observation is accurate, however, it is of no moment, since she noted that VA records indicated Claimant was awarded an 80% service-connected disability. Incidentally, the "official notice" of such disability rating awards have a similar appearance to those issued by the SSA, which explains award amounts, the condition(s) found related to the veteran's military service, the percentage assigned to the condition, the effective date of the award, etc. See, e.g., Aldridge v. Colvin, No. 2:14-cv-24814, 2015 WL 4935631 (S.D.W. Va. Aug. 18, 2015) (Tr. at 158-166).

the decision facing the SSA." Id. at 343. (emphasis added) "[B]ecause the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate." Id.

In addition to the absence of an official VA notice of Claimant's disability rating, the ALJ's express reasoning for assigning little weight was due to the "different rules and specifications" the VA and SSA rely upon in determining disability, which deviates from Bird: "The Fourth Circuit dispelled with the reasoning that substantial weight should not be accorded because the two governmental agencies utilize different processes . . . [however,] an ALJ [is required] to cite evidence in the record that clearly demonstrates that a lesser weight is appropriate." See, Lawson v. Berryhill, No. 5:16-cv-869-FL, 2017 WL 7053965, at *8 (E.D.N.C. Dec. 19, 2017), adopted by, 2018 WL 576843 (E.D.N.C. Jan. 26, 2018) (citing Bird, 669 F.3d at 343). The Social Security Rulings also provide guidance for adjudicators when considering disability determinations from other agencies. According to SSR 06-03p:

> Our regulations . . . make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner . . . However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies . . . Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

2006 WL 2329939, at *6. Here, the ALJ does cite evidence in the record that "clearly demonstrates that such a deviation is appropriate", for starters, there is no VA decision in the record for the ALJ to weigh.

36

The Regulations provide that it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. § 404.1512(a) ("in general, you have to prove to us that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s).") Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment. Id. § 401.1512(c). The Regulations further provide that: "You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence, without redaction, showing how your impairment(s) affects your functioning[.]" Id. In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, he "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

The situation presented in this case is similar to what occurred in <u>Rodgers v. Colvin</u>, No. 5:13-cv-345-D, 2015 WL 636061 (E.D.N.C. Feb. 13, 2015): the VA medical records submitted to the ALJ contained information concerning the disability rating, "but fail to include the VA's decision explaining the rationale behind Claimant's award of benefits" and also, there was no evidence before the ALJ when Claimant was awarded those benefits. <u>Id</u>. at *8. The records in this case indicate that Claimant's 80% disability rating was increased to 90%, adding 10% disability ratings for "limited flexion of knee" (x2) and "knee condition"; the 80% disability rating assigned to "facial scars" remained the same. (Tr. at 994-995) Again, there is no corresponding VA decision in the record related to the increase in disability. See, e.g., <u>Tremble v. Colvin</u>, No. 2:15-CV-00001-D, 2016 WL 484214, at *9 (E.D.N.C. Jan. 20, 2016), *report and recommendation adopted*, No. 2:15-CV-1-D, 2016 WL 528057 (E.D.N.C. Feb. 8, 2016) (finding that the ALJ adequately explained why the VA rating warranted less than substantial weight and acknowledging that the record did "not contain the VA's decision explaining the rationale behind [the plaintiff's] award of benefits").

Moreover, Claimant's application for benefits from the SSA does not concern "facial scars", "tinnitus", "limited flexion of knee", "knee condition", or "traumatic brain disease." More importantly, however, there was no evidence, including opinion evidence, before the ALJ that demonstrated what functional deficits these impairments may cause Claimant. In short, Claimant does not show how the ALJ's failure to give substantial weight to this disability rating with respect to Claimant's left ankle impairment, obesity, and other noted impairments, both severe and non-severe, would have changed the outcome of this case. See also, <u>Lawson v. Berryhill</u>, *supra*.

Notwithstanding the lack of a VA decision(s), the ALJ considered and weighed the VA disability rating, and recognized that Claimant's service-connected disability related to facial scarring, tinnitus, and traumatic brain disease, and noted that two episodes concerning Claimant's head injuries were not service related. In addition to Claimant's testimony, this is also corroborated by the evidence of record, wherein Dr. Syed specifically noted the incidents at the mall and in the gym occurred "after service." (Tr. at 454, 598) Though Claimant alleges that Dr. Syed's evaluations in March 2014 and August 2016 show that his TBI and syncope are severe impairments, this is difficult to reconcile with the fact that syncope is not a listed impairment in the VA disability rating(s). Dr. Syed specifically stated that although Claimant's headaches "are at least as likely as not related to the TBI of service", they were "moderate", and that "medications can help, but Claimant was not taking any prescribed or over the counter medications for his headaches. (Tr. at 847) Dr. Syed further noted that Claimant's syncopal attacks "are unrelated to TBI." (Id.) Thus, it again begs the question how the ALJ's failure to give substantial weight to Claimant's VA disability rating would have changed the outcome of this case.

The Regulations specifically provide that a "decision" by another agency, including the VA, about whether a claimant "is disabled, blind, employable, or entitled to any benefits" is "not binding" on the SSA's decision about whether a claimant is disabled. See 20 C.F.R. § 404.1504. In this case, the ALJ recognized that Claimant's VA disability rating was related to impairments that were not the same impairments before the SSA. Given that there were no VA or other agency decisions before the ALJ to weigh under the auspices of Bird and its progeny, and given that the disability ratings concerned impairments that were not specifically alleged to be disabling, the

undersigned **FINDS** that the "little weight" given to Claimant's VA disability rating(s) did not rise to reversible error necessitating remand.

The RFC Assessment:

Lastly, Claimant contends that the ALJ's RFC assessment is reversible error because it does not properly account for his unsteady left ankle, which was noted by his treating physician, Dr. Lee; the RFC limitations adopted from State agency medical consultants were not based on the totality of the evidence, particularly because those opinions did not include the findings from Claimant's orthopedic consult from the Richmond VA and from Dr. Lee. (ECF No. 15 at 18)

Residual functional capacity represents the *most* that an individual can do despite her limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. See Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In both the regulations and SSR 96–5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative

findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

SSR 96–5p, 1996 WL 374183, at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." Id. Because only the ALJ is tasked with determining the particular facts in a case and to resolve the inconsistencies therein, this Court does not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In this case, the ALJ found that Claimant could perform light work that included the postural and environmental restrictions noted supra; Dr. Boukhemis affirmed the limitations opined by Dr. Lim, only he further restricted Claimant to standing/walking no more than four hours in an 8-hour workday and further limited Claimant to sedentary work. (Tr. at 115) Dr. Boukhemis rendered his opinion in September 2015, which was several months prior to the July 7, 2016 re-evaluation Dr. Traynham, Claimant's orthopedist at the Beckley VA, who referred Claimant to the Richmond VA for a total ankle consult because of Claimant's "chronic left ankle pain and degenerative changes post subtalar joint fusion 2011." (Tr. at 852) As noted supra, on October 31, 2016, the foot and ankle specialist at the Richmond VA opined Claimant was not a good candidate

for a total ankle replacement due to his diabetic condition. (Tr. at 1000) Dr. Boukhemis's opinion

also predates Dr. Lee's May 30, 2017 assessment that Claimant's left ankle was "not stable."[21]

(Tr. at 1005)

As discussed *supra*, these are important medical developments in the record that indicated

Claimant's left ankle impairment deteriorated to the point where injections and custom orthotics

no longer provided the stability and pain relief for this impairment, but that more aggressive

treatment in the form of a total ankle replacement was considered, and appears would have been

performed had Claimant's diabetic condition improved. To that extent, the RFC provisions for

Claimant's limitations in walking, standing, balancing and other postural restrictions could

reasonably have changed on account of these developments. Accordingly, the undersigned **FINDS**

that the RFC assessment with regard to these limitations is not supported by the substantial

evidence.[22]

Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled is not

supported by substantial evidence. Because the issues presented in this appeal necessarily involve

the reconciliation of conflicting evidence, and the weighing of evidence, it is beyond this Court's

jurisdiction to remand with an award for benefits. See SSR 96-8p, 1996 WL 3741784, at *7;

Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Accordingly, despite Claimant's request

for reversal and an award of benefits, remand, not reversal, is the proper remedy. I.N.S. v. Ventura,

---

[21] Though Claimant contends that Dr. Lee further opined Claimant should not work at all, as discussed *supra*, this is not a "medical opinion" entitled to any special significance, and is therefore not pertinent to the RFC determination.

[22] Claimant's contention that "[t]here was absolutely no source evidence for the RFC provision allowing for Plaintiff to elevate his leg elevate his leg 15 minutes at a time, three times a day" (ECF No. 15 at 18) is without merit, because it is clear that Dr. Lee recommended that Claimant elevate his leg for pain relief (Tr. at 1005). Dr. Lee did not elaborate as to how often or how long Claimant should elevate his leg, therefore, the undersigned does not adopt Claimant's characterization that such a provision in the RFC is "ridiculous." (ECF No. 15 at 19)

537 U.S. 12, 16-17 (2002); <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985);

<u>Radford v. Colvin</u>, 734 F.3d 288, 295 (4th Cir. 2013).

**<u>Recommendations for Disposition</u>**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for reversal, but not for entry of an award for benefits (ECF No. 15), **DENY** the Defendant's request to affirm the decision (ECF No. 16), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to obtain an updated medical consultative report based on the totality of the evidence, to properly evaluate the treating physician's opinion, and to reassess Claimant's RFC as discussed *infra*.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

<u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: February 13, 2019.

Omar J. Aboulhosn
United States Magistrate Judge